UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

------------------------------------------------------------------x

FIT FOR LIFE LLC,                                    :
                                                     :
                              Plaintiff,             :    Court No. 20-00004
                                                     :
              v.                                     :
                                                     :
UNITED STATES,                                       :
                                                     :
                              Defendant.             :
                                                     :
------------------------------------------------------------------x

## ORDER

Upon consideration of plaintiff's Motion for Summary Judgment, and all of the pleadings and papers on file herein, and good cause appearing therefor, it is

**ORDERED** that plaintiff's Motion for Summary Judgment be, and hereby is granted; and it is further

**ORDERED** that U.S. Customs and Border Protection shall reliquidate the subject entries under subheading 9401.80.40, HTSUS, and shall refund the assessed duties with interest as provided by law.

_____
Mark A. Barnett, Chief Judge

Dated this ___ day of _____, 20__
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

-----------------------------------------------------------------x
FIT FOR LIFE LLC,                        :
                                        :
                Plaintiff,      :  Court No. 20-00004
                                          :
       v.                             :
                                          :
UNITED STATES,                  :
                                        :
                Defendant.    :
                                        :
-----------------------------------------------------------------x

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Fit For Life LLC, by its undersigned attorneys and pursuant to United States Court of International Trade Rule 56, respectfully moves for summary judgment. In this action, plaintiff challenges defendant's denial of the protests underlying this action and claims classification for the subject merchandise under subheading 9401.80.40, HTSUS.

Summary judgment is appropriate in this case because there are no genuine outstanding issues of material fact. In support of this motion, plaintiff submits a Memorandum of Law; a Statement of Material Facts Not in Dispute; a Declaration of Dr. Larry Frieder; and a Declaration of Tamani George.

Wherefore, plaintiff respectfully requests this Court to grant its motion and order defendant to reliquidate the subject entries under subheading 9401.80.40, HTSUS, and to refund the assessed duties with interest as provided by law.

Respectfully submitted,

Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, 36th Floor
New York, New York 10022
(212) 557-4000
sraymond@gdlsk.com

*/s/ Sarah E. Raymond*
Robert B. Silverman
Sarah E. Raymond

Dated: May 8, 2026
       New York, New York

3

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

----------------------------------------------------------x
                                          :

FIT FOR LIFE LLC,                    :

                                     :

        Plaintiff,           :    Court No. 20-00004

                                     :

        v.                     :

                                     :

UNITED STATES,               :

                                   :

        Defendant.        :
----------------------------------------------------------x

<div align="center">

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

</div>

 

Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, 36th Floor
New York, New York 10022
(212) 557-4000
Robert B. Silverman
Sarah E. Raymond

Dated: May 8, 2026
       New York, New York

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

TARIFF PROVISIONS AT ISSUE.................................................................................... 7

ISSUES OF LAW .............................................................................................................. 7

SUMMARY OF ARGUMENT .......................................................................................... 7

ARGUMENT ..................................................................................................................... 8

    I.    Summary Judgment Is Appropriate. ..................................................................... 8

    II.    CBBCs Are Classified Under Heading 9401, HTSUS. ........................................ 9

    A.  General Rule of Interpretation 1 ......................................................................... 9

    B.  Explanatory Notes.............................................................................................. 11

    C.  Patent Classification Demonstrates the CBBCs' Design as a Chair................................ 11

    D.  Defendant's Position in This Case is Contrary to CBP Precedent.................................. 13

    III.    CBBCs Are Not Classifiable Under Heading 9506...................................................... 15

    A.  Heading 9506 ..................................................................................................... 15

    B.  Principal Use ...................................................................................................... 16

    C.  The Carborundum Factors Establish That the Principal Use of the Class or Kind to Which the Subject Merchandise Belongs Is Seating. ....................................................... 17

    D.  CBP's Treatment of Analogous Merchandise Confirms That the Subject Merchandise Is a Seat........................................................................................................................ 23

CONCLUSION................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*ADC Telecomms., Inc. v. United States*, 916 F.3d 1013 (Fed. Cir. 2019) ................................... 15

*Aromont USA, Inc. v. United States*, 671 F.3d 1310 (Fed. Cir. 2012) .......................................... 23

*Brookside Veneers, Ltd. v. United States*, 847 F.2d 786 (Fed. Cir. 1988) .................................... 16

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999) ................................................ 16

*Essex Manufacturing, Inc. v. United States*, 30 C.I.T. 1 (2006) .................................................... 23

*Kahrs Intern., Inc. v. United States*, 713 F.3d 640 (Fed. Cir. 2013) ............................................. 17

*Link Snacks, Inc. v. United States*, 742 F.3d 962 (Fed. Cir. 2014) ............................................... 15

*Photonetics, Inc. v. United States*, 33 CIT 1549, 659 F. Supp. 1317 (Ct. Int'l Trade 2009)........ 15

*Primal Lite, Inc. v. United States*, 182 F.3d 1362 (Fed. Cir. 1999) ............................................... 26

*Quaker Pet Grp., LLC v. United States*, 287 F. Supp. 3d 1348 (Ct. Int'l Trade 2018) ............... 28

*United States v. Carborundum Co.*, 536 F.2d 373 (CCPA 1976)............................................ 14, 23

*Universal Electronics. Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997) ............................... 15

<u>Statutes</u>

28 U.S.C. § 1581(a) ........................................................................................................................ 8

28 U.S.C. § 2639(a)(1).................................................................................................................. 15

28 U.S.C. § 2640(a) ...................................................................................................................... 15

28 U.S.C. § 2640(a)(1).................................................................................................................. 14

<u>Administrative Materials</u>

*Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report* (USITC Pub. No. 1400) (June 1983). .............................................................................................................................................. 23

U.S. Patent & Trademark Office, *Manual of Classification*, Class D21, Games, Toys, and Sports Goods (rev. Oct. 2000)............................................................................................................ 18

<u>Court Rules</u>

USCIT R. 56(a)............................................................................................................................. 14

<u>Customs Rulings</u>

HQ H313575 (Mar. 26, 2021)....................................................................................................... 19

NY N074173 (Sep. 25, 2009) ................................................................................................. 20, 21

NY N320579 (July 27, 2021)........................................................................................................ 19

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. MARK A. BARNETT, CHIEF JUDGE

--------------------------------------------------------x
                                        :

FIT FOR LIFE LLC,                        :

     Plaintiff,                   :     Court No. 20-00004

     v.                         :

UNITED STATES,                    :

     Defendant.                :
--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

### <u>INTRODUCTION</u>

The issue in this case is whether balance ball chairs (the "CBBCs"), which are designed and used as office seating, are properly classified under the Harmonized Tariff Schedule of the United States ("HTSUS") under heading 9401 as "[s]eats . . . , whether or not convertible into beds, and parts thereof."

U.S. Customs and Border Protection ("CBP") incorrectly classified the subject merchandise upon liquidation under heading 9506, HTSUS, which provides for, in relevant part, "[a]rticles and equipment for general physical exercise."

The subject merchandise is fully and specifically described in heading 9401, HTSUS, as a seat. Plaintiff moves for summary judgment holding that the CBBCs are classifiable under subheading 9401.80.40, HTSUS.

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(a),[1] and there are no genuine issues of material fact to be resolved at trial. Therefore, summary judgment is appropriate.

STATEMENT OF FACTS

The subject merchandise consists of Gaiam-branded CBBCs imported by Fit For Life LLC ("Fit For Life" or "Plaintiff") on December 12, 2016, under entry number 791-0952957-3. Plaintiff's Statement of Material Facts Not in Dispute ("SMF") ¶ 1. The subject CBBC models are 05-58865, 05-58867, 05-62215, and 610-600RTL. *Id.* ¶ 8. The four model numbers identify the same physical product and differ from one another only in the color of the inflatable ball. *Id.*

Each unit of the subject articles consist of: a molded plastic chair frame designed to rest upon the floor, incorporating a circular base and a T-shaped backrest; four swivel caster wheels with locking mechanisms; a removable, inflatable polyvinyl chloride ball cushion measuring 52 centimeters in diameter; and a metal support bar positioned horizontally across the front of the frame, which constrains the inflatable ball in position. *Id.* ¶ 9.

The article is designed to support users weighing as much as 300 pounds and to accommodate users of heights ranging from five feet to five feet eleven inches. *Id.* ¶ 10. The article is designed to fit beneath standard-height desks. *Id.* ¶ 11. The merchandise was manufactured by Ciber Industrial Co., Ltd. in Taiwan. *Id.* ¶ 12.

The design of the subject merchandise is the subject of United States Patent No. 6,832,817, entitled "Ball Chair." *Id.* ¶ 13. The patent has been classified by the United States Patent and Trademark Office under United States Patent Classification Class 297 (Chairs and

---

[1] Plaintiff timely protested the liquidation of the subject entry. *Id.* ¶ 5. All liquidated duties, charges, and exactions were paid prior to the commencement of this action. *Id.* ¶ 7. The protest and the summons in this action were timely filed. Answer ¶ 3.

2

Seats), Subclass 452.41, and under Cooperative Patent Classification A47C 7/02 (Chairs). *Id.* ¶ 14. The principal stated purpose of the patent is "to provide a ball chair with strengthening blocks that avoid a seat cracking at joints where multiple legs are attached, whereby, the ball chair is safe and steady," and a another main objective is to provide a ball chair with "a detachable post attached between the seat and the leg to adjust the height of the ball chair." *Id.* ¶ 15. The patent specification describes the inflatable cushion as a passive seating surface and provides that, "when a user sits on the ball chair, the ball-shaped cushion…is pressed to deform and biased to the front edge of the seat," and the guard rod "stops the ball-shaped cushion…from further deforming to avoid the malpositioning of the ball-shaped cushion…, which may otherwise cause the user to fall from the ball chair." *Id.* ¶ 16. The patent contains no reference to exercise, fitness, gymnastics, athletics, or therapeutic use. *Id.* ¶ 15. Each design element described in the patent, including the backrest, the guard rod, the wheeled casters, and the height-adjustable legs, serves a conventional chair function. *Id.* ¶ 16.

When the product was first introduced, a study was conducted to test consumer reaction to the CBBCs. The study was sponsored by Gaiam and Lumo BodyTech and was conducted by researchers at Stanford University (the "Stanford Study"). The study evaluated the use of a balance ball chair by participants who "were asked to work as they normally would during the experiment session" at their employers' offices. *Id.* Ex. F. The Stanford Study found that participants sitting on a balance ball chair experienced improved posture, increased perceived engagement of core muscles, increased energy levels, and no increase in discomfort as compared with use of a typical office chair. *Id.* ¶ 24.

Fit For Life's marketing materials describe the CBBCs as office furniture intended for use at desks. Those materials state that the CBBCs "provide[s] ergonomic back support, spinal alignment, and core engagement" and that the article is intended for use at desks in home or office environments. *Id.* ¶ 25. The packaging depicts the product in use at an office desk by an office-attired user, accompanied by the slogans "Sit Better. Feel Better." *Id.* Ex. D.

The article is sold through retailers as office furniture. Brick-and-mortar retailers also display the CBBCs as office furniture. *Id* ¶ 29 & Ex. D. Photographs in the record establish that the CBBCs are displayed in the office furniture department of Office Depot stores, adjacent to executive office chairs, conventional desk chairs, and chair mats. *Id*.

On Walmart.com, CBBCs appear in both the "Office Furniture" category and the "Sports & Outdoors" category. *Id.* ¶ 26. Walmart.com's "Compare with similar items" module displays the CBBCs alongside office chairs. *Id.* ¶ 20 & Ex. D. The comparison module does not display the CBBCs alongside standalone exercise balls or other exercise equipment. *Id.* Walmart.com further offers an "Office Chair Assembly" service for the CBBCs. *Id.* ¶ 28. On Amazon.com, the CBBCs appear in both the "Home Office Chair" category and the "Sports & Outdoors" category. *Id.* ¶ 26.

The retail price of the CBBCs reflect their identity as office furniture rather than as exercise equipment. The CBBCs retailed for approximately sixty dollars to seventy dollars. *Id.* ¶ 19. By contrast, stand-alone exercise balls retailed for approximately ten dollars to twenty dollars. *Id.* The price differential reflects the additional structural components of CBBCs, including the molded plastic chair frame, the T-shaped backrest, the casters, and the metal support bar. *Id.* ¶ 17. None of those components are present on a stand-alone exercise ball. *Id.*

4

Each unit of the subject merchandise was packaged with a printed Desktop Exercise Guide at the time of importation and sale. *Id.* ¶ 21. The Desktop Exercise Guide (the "Guide") depicts a series of simple stretching activities, each of which is performed while the user is on an assembled CBBC; the Guide does not depict any activity using the inflatable cushion independently of the chair frame. *Id.* ¶ 22 & Ex. C. The stretching activities depicted in the Guide can be performed in nearly any office chair. *Id.* ¶ 23. The CBBCs were not imported or sold with exercise accessories such as resistance bands, exercise mats, or instructional video media. *Id.* ¶ 18.

Consumer reviews of CBBCs consistently describe its use as office seating. Online consumer reviews describe using the CBBCs at desks, in offices, and in classrooms; while working at computers; and as an alternative to traditional office chairs. *Id.* ¶¶ 31, 32. Reviewers further describe using CBBCs for sewing, studying, teaching, and watching television, and for the purpose of improving posture and comfort while seated. *Id.* ¶ 33. Representative reviews characterize CBBCs as "office chair[s]," a "desk chair[s]," or as "alternative[s]" to traditional office seating. *Id.* ¶ 30 & Ex. E.

Plaintiff's expert, Dr. Larry Frieder, DC, is a Doctor of Chiropractic and the owner of Boulder Sport and Spine, LLC, with more than thirty-five years of professional experience in the health and wellness field, including chiropractic care, sports medicine, ergonomic education, and workplace assessment. *Id.* ¶¶ 36, 37. Dr. Frieder served for more than twelve years as a chiropractic consultant at the University of Colorado/Boulder Health Center. *Id.* ¶ 34. He completed coursework to become an Associate Member of the International Academy of Chiropractic Occupational Health Consultants, an organization focused on workplace ergonomics. *Id.* ¶ 37. CBBCs have been used continuously at the front desk of Dr. Frieder's

clinic for ten years, where it has functioned as an office chair used by Dr. Frieder and by his staff. *Id.* ¶ 40.

Based upon a decade of personal and clinical observation of CBBCs in office use, Dr. Frieder offers his expert opinions regarding CBBCs. CBBCs promotes better posture by encouraging upright sitting and by reducing slouching through the need for ongoing postural adjustments. *Id.* ¶ 42. The design of CBBCs combines the benefits of an unstable sitting surface with the safety and stability of a traditional office chair. *Id.* ¶ 44. Based upon comparison of all-day use of CBBCs with use of an unsupported exercise ball, the fatigue concerns associated with unsupported exercise balls are minimized in CBBCs because a CBBC "functions as a supported office chair rather than as an exercise ball." *Id.* ¶ 45. CBBCs are "suitable for use as an everyday office chair," and "any stretching or balancing movements that could theoretically be performed while sitting on the CBBC are insignificant compared to its main purpose as an office chair." *Id.* ¶ 46.

CBP has previously classified balance ball seating articles substantively similar to the subject merchandise under heading 9401, HTSUS. In granting Protest No. 4102-18-100212, CBP classified balance ball stools, sold under the Gaiam brand, under heading 9401, HTSUS. *Id.* ¶ 35 & Ex. G. The articles at issue in that protest consist of a domed inflatable polyvinyl chloride seat, a wheeled molded base, and casters, and are sold as office furniture. *Id.* The balance ball stools differ from the subject merchandise in only one material respect, which is the absence of a backrest. *Id.*

TARIFF PROVISIONS AT ISSUE

(citations to 2016 HTSUS)

| Heading/Subheading | Description |
|---|---|
| 9401 | Seats (other than those of heading 9402), whether or not convertible into beds, and parts thereof: |
| 9401.80 | Other seats: |
| 9401.80.40 | Of rubber or plastics: |
| 9506 | Articles and equipment for general physical exercise, gymnastics, athletics, other sports (including table-tennis) or outdoor games . . . ; parts and accessories thereof: |
| 9506.91 | Articles and equipment for general physical exercise, gymnastics or athletics; parts and accessories thereof: |
| 9506.91.00 | Other |

ISSUES OF LAW

1.    Whether the subject CBBCs are classifiable as seats under subheading 9401.80.40, HTSUS.

2.    Whether the subject CBBCs are classifiable as exercise equipment under subheading 9506.91.00, HTSUS.

SUMMARY OF ARGUMENT

CBBCs are chairs. They consist of a molded plastic chair frame with a circular base, a T-shaped backrest, four locking swivel caster wheels, and a horizontal metal support bar that retains an inflatable cushion on which the user sits. They are designed to fit beneath standard-height desks and to function as office seating. They are marketed, sold, and used as office seating. Heading 9401, HTSUS, is an *eo nomine* provision that provides for "[s]eats." Because

7

the subject merchandise is a seat, it is *prima facie* classifiable under Heading 9401, HTSUS, by application of General Rule of Interpretation (GRI) 1.

Subheading 9506.91, HTSUS, is a principal use provision. The principal use of the class or kind of merchandise to which the subject CBBCs belong is seating, not exercise. Each of the seven factors articulated in *United States v. Carborundum Co.*, 536 F.2d 373 (CCPA 1976), supports classification outside of heading 9506, HTSUS and within heading 9401, HTSUS. The general physical characteristics of the article, the expectation of the ultimate purchaser, the channels of trade, the environment of sale, the manner of use, the economic practicality of use, and the recognition of the article in the trade are each consistent with office seating and are not consistent with exercise equipment. CBP itself has previously classified analogous balance ball seating articles, which differ from the subject merchandise only in the absence of a backrest, as seats under heading 9401, HTSUS.

<div align="center">ARGUMENT</div>

I.    <u>Summary Judgment Is Appropriate.</u>

This Court reviews the denial of a protest *de novo*. 28 U.S.C. § 2640(a)(1). A grant of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). This case can be resolved by summary judgment as there are no genuine disputed issues of material facts. The structural components of CBBCs, the manner in which the article is marketed and sold, and the manner in which the article is used by purchasers are not in dispute. Because these material facts are undisputed, this case is suitable for resolution by summary judgment.

What remains is for the Court to determine whether plaintiff is entitled to judgment as a matter of law.  A classification case generally involves a two-step analysis.  *ADC Telecomms.,*

<div align="center">8</div>

*Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019) . In the first step, the Court determines the proper meaning of the terms in the relevant tariff provisions, which is a question of law. *See Link Snacks, Inc. v. U.S.*, 742 F.3d 962, 965 (Fed. Cir. 2014) . In the second step, the Court determines whether the merchandise at issue properly falls within the description of those terms, which is a question of fact. *Id*. "However, when there is no dispute as to the nature of the merchandise, then the two-step classification analysis 'collapses entirely into a question of law.'" *Id*. at 965–66 (citation omitted).

Here, there is no material dispute as to the nature of the subject merchandise. Accordingly, the classification question before the Court is a question of law. In such instances, this Court reviews classification cases *de novo*, in accordance with 28 U.S.C. § 2640(a). *Photonetics, Inc. v. U.S.*, 33 CIT 1549, 1554, 659 F. Supp. 1317, 1321 (Ct. Int'l Trade 2009) (citing *Bousa, Inc. v. United States*, 25 CIT 386, 387 (2001). While a presumption of correctness attaches to CBP's classifications pursuant to 28 U.S.C. § 2639(a)(1), "this presumption 'is irrelevant where there is no factual dispute between the parties.'" *Id*. at 1553–54.

II.    CBBCs Are Classified Under Heading 9401, HTSUS.

  A.    General Rule of Interpretation 1

Tariff classification is governed by the General Rules of Interpretation of the HTSUS, applied in numerical order. GRI 1 provides that classification "shall be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. In the event that the goods cannot be classified solely on the basis of GRI 1, and if the headings or notes do not require otherwise, the remaining GRIs 2 through 6 may be applied.

The terms of the heading, as well as the applicable chapter notes, demonstrate classification under heading 9401. Heading 9401, HTSUS, provides, in relevant part, for "*Seats*

(other than those of heading 9402 which are not at issue here), whether or not convertible into beds, and parts thereof" (emphasis added).

An *eo nomine* provision includes all forms of the named article unless limited by its terms. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citing *Hayes-Sammons Chem. Co. v. United States*, 55 C.C.P.A. 69, 75 (1968)). The term "seat" in Heading 9401, HTSUS, is an *eo nomine* designation. Because the subject merchandise is a seat, it is *prima facie* classifiable under Heading 9401, HTSUS.

In the absence of contrary legislative intent, the terms of the HTSUS are construed in accordance with their common and commercial meanings, which are presumed to be the same. *Carl Zeiss,* 195 F.3d at 1379. In ascertaining the common meaning of an HTSUS term, courts "may consult dictionaries, scientific authorities, and other reliable sources of information." *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988). The ordinary meaning of "seat" is "a chair, stool, or bench intended to be sat in or on." Merriam-Webster's Collegiate Dictionary, https://www.merriam-webster.com/dictionary/seat (last visited April 30, 2026). The subject merchandise fits squarely within this definition; it is an article on which a person sits.

Under GRI 1, chapter notes are binding. Note 2 to Chapter 94 provides that articles are to be classified under heading 9401 only if such articles are designed for placing on the floor or ground. General note (A) to Chapter 94 also define the scope of "furniture" within the chapter to include:

> Any "movable" articles (**not included** under other more specific headings of the Nomenclature), which have the essential characteristic that they are constructed for placing on the floor or ground, and which are used, mainly with a utilitarian purpose, to equip *private dwellings*, hotels, theatres, cinemas, *offices*, churches, schools, cafés, restaurants, laboratories, hospitals, dentists'

10

surgeries, etc., or ships, aircraft, railway coaches, motor vehicles, caravan-trailers or similar means of transport. (It should be noted that, for the purposes of this Chapter, articles are considered to be "movable" furniture even if they are designed for bolting, etc., to the floor, e.g., chairs for use on ships). Similar articles (seats, chairs, etc.) for use in gardens, squares, promenades, etc., are also included in this category.

(emphasis added (italics); bold in original)

The range of potential locations for furniture use under Chapter 94 is broad, yet the Chapter Note does not reference gyms or similar settings; the note does, however, reference private dwellings and offices. This omission suggests that chairs intended for use in a gym were not contemplated within Chapter 94. The subject merchandise is a movable article designed to be sat upon, placed upon the floor, and to be used in offices and homes for utilitarian purposes.

B.    Explanatory Notes

The Harmonized Commodity Description and Coding System, Explanatory Notes ("ENs") constitute the official interpretation of the Harmonized System at the international level. While neither legally binding nor dispositive, the ENs provide a commentary on the scope of each heading of the HTSUS and are generally indicative of the proper interpretation of these headings. *Kahrs Intern., Inc. v. United States*, 713 F.3d 640,645 (Fed. Cir. 2013) (citing *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000)). The EN to heading 9401 states that "this heading covers all seats," and lists by way of example many types of seats, demonstrating the breadth of the term: piano stools, lounge chairs, high chairs, benches, couches, car seats, etc. The heading intends to be comprehensive: couches remain in this heading even if they are convertible into beds; seats are included even if they vibrate or play music. ENs to Heading 9401. CBBCs are included even though the seat cushion is filled with air.

C.    Patent Classification Demonstrates the CBBCs' Design as a Chair.

11

The CBBCs' design embodies each of the characteristics of the seats described in the ENs. It has a frame designed to rest upon the floor; a base; legs; a seating surface; a backrest; locking caster wheels for mobility; and a structural support bar. *Id.* ¶ 9. The United States Patent and Trademark Office ("USPTO") classified the CBBC patent (patent no. 6,832,817), under USPC Class 297 (Chairs and Seats) and CPC Class A47C 7/02 (Chairs). *Id.* ¶¶ 13, 14. The stated purpose of the patent is to address conventional furniture engineering concerns, including the cracking of seats at the joints with the legs, structural stability, and height adjustability. *Id.* ¶¶ 15, 16. The patent does not use the word "exercise" at all. *Id*. Ex. B.

Class 297 of the USPC and Class A47C 7/02 of the CPC are both dedicated to chairs and seating, while CPC Class A63B and USPC Class 482 are reserved for products designed to function as exercise equipment. *See* U.S. Patent & Trademark Office, *Manual of Classification*, Class D21, Games, Toys, and Sports Goods (rev. Oct. 2000), https://www.uspto.gov/web/offices/ac/ido/oeip/taf/moc/d21.htm (last visited May 6, 2026).

Patent classifications are not arbitrary. The USPTO maintains a separate set of classes dedicated specifically to exercise equipment (for example, CPC Class A63B for apparatus for physical training, etc. and USPC Class 482 for exercise devices) and the patent examiner did not place the CBBC patent in either. That outcome reflects deliberate application of the USPTO's categorization rules.

The USPTO determined that the controlling feature of the patented article is its function as a chair, not as exercise equipment. Had the CBBC's predominant character been that of exercise equipment, the patent would have been placed in those classes. It was not. CBBCs are, as the USPTO's own classification reflects, designed as a seat, consistent with the ENs and with the heading language itself.

D.    Defendant's Position in This Case is Contrary to CBP Precedent.

CBP's reasoning in NY N320579 (July 27, 2021) confirms that incidental movement or balance does not transform a seat into exercise equipment. In that ruling, CBP considered a wooden swing seat designed to be suspended from a tree or rafter, and capable of gentle swinging. Despite the inherent motion involved, CBP rejected classification under heading 9506, HTSUS, explaining that the article "does not provide the user with meaningful exercise and a reasonable degree of physical activity." CBP instead classified the article as a seat under heading 9401, relying on Chapter 94 notes that expressly include seats designed to be hung and finding that the essential character of the article was seating. That analysis applies with equal force here. If a suspended swing seat, which moves by *design*, does not constitute exercise equipment within heading 9506, then CBBCs likewise cannot be classified as exercise equipment based on passive muscle engagement that simply arises from sitting on an unstable seating surface. As in N320579, any bodily movement associated with the CBBCs' instability does not amount to "general physical exercise" within the meaning of Heading 9506.

CBP's holding in HQ H313575 (Mar. 26, 2021) confirms that an article does not lose its character as a seat merely because it incorporates a secondary, non-seating function. There, CBP considered the "Simon Power Chair," a 300-pound electro-mechanical seat with motorized recline, incline, and lift functions, integrated heating, and a built-in massage system operated by remote control. The two provisions under consideration were heading 9019, HTSUS, as a massage apparatus and heading 9401, HTSUS, as a seat. CBP concluded that the chair was "designed to be a seat" and that the "essential character of the article is defined by its use as seating."

13

CBP distinguished articles "designed principally as a massage apparatus" from articles "designed to be a seat" that happen to incorporate a secondary function, noting that the Simon Power Chair was "not principally designed to be primarily used as a massage device." The dispositive question was which use drove the design.

That framework should control here. CBBCs consists of a stability ball seated in a wheeled metal frame with back support, sized and proportioned to function as a desk chair. Every design choice is oriented to extended seated use at a workstation: the rolling caster base, the back rest, and the seat height calibrated to standard desk surfaces. None of these features serves an exercise function. The frame, casters, and back rest are present because the article is designed to be sat on for hours at a time in the place that a conventional chair would occupy.

The exercise-related attribute, that sitting on the ball passively engages postural muscles, is a byproduct of the seat surface, not the function for which CBBCs were built. That sitting on a stability ball passively engages postural muscles is, if anything, a less significant competing function than the active massage and heat systems CBP found insufficient as a principal use in HQ H313575. As in that ruling, the secondary attribute (exercise) is overshadowed by design catered to seating. CBBCs are properly classified under heading 9401.

In NY N074173 (Sep. 25, 2009), CBP addressed the classification of infant products that incorporated bouncing, swiveling, and interactive elements, including motion jumpers and activity centers. The products are seats for an infant that restrict unsupported movement, allowing the child to remain seated while interacting with surrounding elements.

CBP concluded that the products' fundamental role was seating, and that the movement-related features were secondary to that function. The presence of bouncing or swiveling mechanisms did not alter the articles' identity as seats, because those elements did not

14

supersede the seating function. CBP rejected alternative classifications that elevated activity or motion over function, finding that features promoting movement do not redefine an article when its dominant use is seating. On that basis, the products were classified as seats rather than as toys or activity articles.

That reasoning applies directly to CBBCs. CBBCs are designed to support a person in a seated position at a workstation. Although CBBCs allow for dynamic sitting and may require the user to engage stabilizing muscles, those effects arise from the manner in which the seating surface responds to passive movement, not from a design intended for exercise. As with the infant products, the presence of minor corrective motions does not alter the CBBC's identity. CBBCs are not principally used for workouts or exercise routines, but for seated work at desks and tables. Consistent with the reasoning set forth in NY N074173, CBBCs retain their character as seats and should not be classified based on minor health benefits.

III.    CBBCs Are Not Classifiable Under Heading 9506.

    A.    Heading 9506

CBP classified the subject merchandise upon liquidation under subheading 9506.91.0030, HTSUS. Heading 9506, HTSUS, provides for, among other things, "articles and equipment for general physical exercise, gymnastics, athletics, [or] other sports." Subheading 9506.91, HTSUS, provides for "articles and equipment for general physical exercises, gymnastics or athletics; parts and accessories thereof." That classification is incorrect for the reasons that follow.

Subheading 9506.91.00, HTSUS, covers articles for general physical exercise. Principal use also governs the classification of articles under heading 9506. As set out in EN 9506, the heading encompasses the following articles for general physical exercise:

> (A) Articles and equipment for general physical exercise, gymnastics or athletics, e.g.:

15

> Trapeze bars and rings; horizontal and parallel bars; balance beams, vaulting horses; pommel horses; spring boards; climbing ropes and ladders; wall bars; Indian clubs; dumb-bells and bar-bells; medicine balls; jump balls with one or more handles designed for physical exercises; rowing, cycling and other exercising apparatus; chest expanders; hand grips; starting blocks; hurdles; jumping stands and standards; vaulting poles; landing pit pads; javelins, discuses, throwing hammers and putting shots; punch balls (speed bags) and punch bags (punching bags); boxing or wrestling rings; assault course climbing walls.

These exemplars are, without exception, articles a user actively engages with to perform a discrete physical activity, whether by gripping, mounting, throwing, striking, or maneuvering against the apparatus. None of these items are designed to be passively occupied for hours at a time as a place to work, read, or otherwise sit.

B.    Principal Use

CBBCs arguably can be used for two purposes: as furniture (a seat classifiable under heading 9401); and, to a much lesser extent, an article for physical exercise (classifiable under heading 9506). Subheading 9506.91, HTSUS, is a principal use provision. Under Additional United States Rule of Interpretation 1(a):

> a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of goods of that class or kind to which the imported goods belong, and the controlling use is the principal use.

Add. U.S. R. Interp. 1(a), HTSUS.

"Principal use" is defined as the use "which exceeds any other single use." *Conversion of the Tariff Schedules of the United States Annotated Into the Nomenclature Structure of the Harmonized System: Submitting Report* at 34-35 (USITC Pub. No. 1400) (June 1983). To determine the relevant class or kind, the Federal Circuit applies the seven-factor analysis articulated in *Carborundum* (the "*Carborundum* factors"):

16

(1) the general physical characteristics of the merchandise;

(2) the expectation of the ultimate purchasers;

(3) the channels of trade in which the merchandise moves;

(4) the environment of sale (*i.e.*, the manner in which the merchandise is advertised and displayed);

(5) the use, if any, in the same manner as merchandise that defines the class;

(6) the economic practicality of so using the import; and

(7) the recognition in the trade of this use.

*See Carborundum*, 536 F.2d at 377. While these factors were developed under the Tariff Schedule of the United States (predecessor to the HTSUS), the courts have also applied them under the HTSUS. *See*, *e.g. Aromont USA, Inc. v. United States*, 671 F.3d 1310 (Fed. Cir. 2012); *see also Essex Manufacturing, Inc. v. United States*, 30 C.I.T. 1 (2006).

C.      The Carborundum Factors Establish That the Principal Use of the Class or Kind to Which the Subject Merchandise Belongs Is Seating.

Each of the *Carborundum* factors supports classification under Heading 9401, HTSUS, and not Heading 9506, HTSUS.

(1) General Physical Characteristics. The general physical characteristics of the subject merchandise are those of a chair. The subject merchandise consists of a molded plastic chair frame incorporating a circular base and a T-shaped backrest, four locking swivel caster wheels, an inflatable polyvinyl chloride cushion, and a horizontal metal support bar. SMF ¶ 9. None of these structural components is present on a stand-alone exercise ball, which is the only feature that could lend itself to being exercise-related. *Id.* ¶ 17. Each of the structural components serves a recognized chair function. The chair frame and the circular base hold the article upright at desk height and provide a stable foundation for the article on the floor. *Id.* ¶¶ 9, 11. The T-shaped backrest provides lumbar support to the seated user. *Id.* ¶ 9. The locking caster wheels permit the

article to be moved across an office floor when unlocked and to remain stationary when locked. *Id.* The metal support bar functions as a guard rod, retaining the inflatable cushion within the frame and preventing the cushion from displacing under the weight of the user. *Id.* ¶ 16. Each of these components is a principal structural feature of the article.

The dimensions of the subject merchandise also confirm its character as office furniture. The article is designed to fit beneath standard-height desks. *Id.* ¶ 11. It is designed to accommodate users of heights ranging from five feet to five feet eleven inches and to support users weighing as much as 300 pounds. *Id.* ¶ 10. These dimensions are characteristic of conventional office seating. They are not characteristic of exercise equipment.

Further, use of the subject merchandise in the manner of an exercise ball is not physically practical. The chair frame, the casters, and the support bar physically prevent the article from being used in the manner that defines an exercise ball, that is, as a freely movable inflatable sphere on a floor or mat.

(2) Expectation of the Ultimate Purchaser. The ultimate purchaser of the subject merchandise expects to acquire a chair and not exercise equipment. Online consumer reviews of CBBCs consistently describe the article in furniture-related terms, characterizing it as an "office chair," a "desk chair," or an "alternative" to traditional office seating. *Id.* ¶¶ 31, 32 & Ex. E. The reviews describe the use of the article "at desks, in offices, and in classrooms;" "while working at computers;" and for sewing, studying, teaching, and watching television. *Id.* ¶¶ 32, 33. Representative reviews include the following statements: "I've been sitting on it for about a month, and I have now actually just gotten rid of my (not so) old desk chair." *Id.* Ex. E. "This is a good sitting height for at my desk." *Id.* The marketing and packaging of the article are consistent with this expectation. The CBBCs' packaging depicts users seated at office desks

18

accompanied by the slogans "Sit Better. Feel Better." *Id.* Ex. D. The marketing materials in the record do not advertise the article as a substitute for exercise equipment.

Articles about CBBCs or ball chairs, generally, influence the way that consumers perceive the CBBC. Articles uniformly reflect that CBBCs are understood by the consumer to be a form of office seating rather than exercise equipment. A Chicago Tribune article explains that a "ball chair… can be used in place of a standard desk chair" and distinguishes it from exercise products by noting that its limits are for "exclusively sitting on a ball chair versus exercise-style balls…for…exercise." *Id.* ¶ 47 & Ex. H-1. Other sources reinforce this consistent framing: a GeekMom review explains that the chair is used at a desk and allows the user "to sit more comfortably at [their] desk," likewise treating it as an alternative to conventional office seating. *Id.* ¶ 49 & Ex. H-3.

An interior design article titled "5 Office Chair Alternatives" places CBBCs among workplace seating and explicitly differentiates it from an "actual fitness ball," while a Wisestep article similarly identifies the balance ball chair (or "ball stand chair") as part of a set of alternatives intended to improve comfort for individuals who work a "9-5 job" or "inside an office," explaining that these solutions make "working in a chair" healthier. *Id.* ¶¶ 48, 50 & Exs. H-2, H-4. An Autonomous article characterizes the product as a "ball chair for [the] office" used by employees who must sit at desks, explaining that "it is not possible to eliminate sitting from our lives, especially for office workers," thereby framing the product as a seating solution for prolonged desk work rather than exercise. *Id.* ¶ 51 & Ex. H-5.

(3) Channels of Trade. The subject merchandise moves through the channels of trade for office furniture. On Walmart.com, CBBCs are categorized in "Office Furniture." *Id.* ¶ 26. The "Compare with similar items" module on Walmart.com displays CBBCs alongside office chairs.

*Id.* ¶ 26 & Ex. D. The comparison module does not display CBBCs alongside standalone exercise balls or other exercise equipment. *Id.* Walmart.com further offers an "Office Chair Assembly" service for the article. *Id.* ¶ 28. The article also moves through brick-and-mortar office furniture channels of trade. The photographs in the record establish that CBBCs are displayed in the office furniture department of Office Depot stores, adjacent to executive office chairs. *Id.* ¶ 29 & Ex. D.

CBBCs also appear in the secondary categorization "Sports & Outdoors" on Walmart.com and Amazon.com. *Id.* ¶¶ 26, 27. Dual categorization on retailer websites does not establish that the principal use of the article is for exercise. Courts have held that the "purpose of 'principal use' provisions in the HTSUS is to classify particular merchandise according to the ordinary use of such merchandise, even though particular imported goods may be put to some atypical use." *Primal Lite, Inc. v. United States*, 182 F.3d 1362, 1364 (Fed. Cir. 1999). The relevant question under *Carborundum* is which category reflects the actual class or kind to which the article belongs. The "Compare with similar items" module on Walmart.com, which is an objective indicator of the manner in which the retailer's algorithms classify CBBCs against substantively comparable products, displays only office chairs. *Id.* ¶ 26.[2]

(4) Environment of Sale. The environment in which the subject merchandise is advertised and displayed is consistently an office environment. The marketing materials state that CBBCs

---

[2] Amazon's and Walmart's Sports & Outdoors category listings, generally, demonstrate that the category may be overinclusive and inconsistent. Amazon and Walmart categorize a wide range of non-exercise items in that section, including products that are only incidentally related to physical activity. Items such as water bottles, air mattresses, tables, balloon inflators, and even a rock opera music album are categorized in Amazon's Sports & Outdoors section, and items such as women's shirts, men's pants, and cans of chicken and rice are categorized in Walmart's Sports & Outdoors section. While each of these items may be used in a sports or outdoor context (for example, a water bottle during exercise, an air mattress outdoors, music during a workout, a shirt used for exercising) none are exclusively intended for such use. Amazon's categorization decisions can be attenuated or arbitrary rather than tied to a product's ordinary function. *Id.* ¶ 53 & Exs. I-1, I-2.

"provide[] ergonomic back support, spinal alignment, and core engagement" and are intended for use at desks in home or office environments. *Id.* ¶ 25. The packaging depicts an individual using a CBBC at an office desk while working on a laptop computer. *Id.* Ex. D. The 2015 to 2016 Gaiam product catalog markets CBBCs under the headline "Sit BETTER, Feel BETTER," which is a seating value proposition rather than an exercise value proposition. *Id.* The Office Depot "Active Workplace" advertisement displays CBBCs in a section titled "Sit better. Feel better. Strengthen your core," in proximity to sit-stand desks. *Id.* To the extent the marketing materials describe ergonomic benefits associated with the use of the CBBC, those benefits are described in the context of seating, as reflected in the recurring slogan "sit better," and not in the context of an exercise routine.

(5) Use in the Same Manner as Merchandise That Defines the Class. The fifth *Carborundum* factor concerns whether the imported article is used in the same manner as the merchandise that defines the relevant class. The relevant inquiry is whether the subject merchandise is used in the same manner as exercise equipment. The record establishes that it is not. The subject merchandise is used in the same manner as an office chair. The user sits on the article at a desk while performing seated work activities, including typing, reading, writing, sewing, watching television, teaching, or studying. *Id.* ¶¶ 32, 33. Dr. Frieder, supported by a decade of clinical observation, opines that CBBCs are "suitable for use as an everyday office chair," "function[] as a supported office chair rather than as an exercise ball," and "any stretching or balancing movements that could theoretically be performed while sitting on the CBBC are insignificant compared to its main purpose as an office chair." *Id.* ¶¶ 45, 46. The Stanford Study, conducted in a real workplace setting, observed participants using CBBCs

during a one-hour work session in which the participants performed their ordinary work duties. *Id.* Ex. F.

The Desktop Exercise Guide does not establish use of the article in the manner of exercise equipment. The Guide does not depict any use of the inflatable ball apart from the chair frame. *Id.* The activities depicted in the Guide can be performed in nearly any office chair. *Id.* A handful of optional stretches available to a seated user does not redefine the principal use of the article. Occasional or incidental uses do not control principal use analysis. *Quaker Pet Grp., LLC v. United States*, 287 F. Supp. 3d 1348, 1356 (Ct. Int'l Trade 2018).

(6) Economic Practicality. CBBCs retailed for approximately sixty dollars to seventy dollars. SMF ¶ 19. By contrast, comparable standalone exercise balls retailed for approximately ten dollars to twenty dollars. *Id.* A consumer purchasing exercise equipment would have no rational reason to pay a premium of approximately forty dollars to sixty dollars over the cost of a standalone exercise ball in order to acquire the chair frame, the casters, the support bar, and the backrest, if those components were extraneous to the principal use of the article. The price premium is rational only because those components serve a seating function. The market price of the article therefore reflects, and confirms, its identity as office furniture rather than as exercise equipment.

(7) Recognition in the Trade. The trade recognizes the subject merchandise as office furniture. Major retailers list, display, and service CBBCs as office furniture. CBBCs are categorized as "Office Furniture" on Walmart.com, *Id.* ¶ 26; is offered with an "Office Chair Assembly" service on Walmart.com, *Id.* ¶ 28; is categorized as a "Home Office Chair" on Amazon.com, *Id.* ¶ 27; and is displayed in the office furniture department of Office Depot stores

22

in an office furniture section, *see id.* Ex. D. Please refer to the discussion set forth in (2) Expectation of the Ultimate Purchaser above.

Taken together, the seven *Carborundum* factors establish that the principal use of the class or kind of merchandise to which the subject merchandise belongs is seating, and not exercise.

D.   CBP's Treatment of Analogous Merchandise Confirms That the Subject Merchandise Is a Seat.

CBP has previously classified analogous balance ball seating articles as seats under Heading 9401, HTSUS. In granting Protest No. 4102-18-100212, CBP classified Gaiam High-Rise Balance Ball Stools under subheading 9401.30.8030, HTSUS. SMF ¶ 35 & Ex. G. The articles at issue in that protest consist of a domed inflatable seat, a wheeled molded base, and caster wheels, and are advertised and sold as office furniture. *Id.* Ex. G. The balance ball stools are substantively very similar to the subject merchandise in all material respects but one, which is the absence of a backrest. The marketing materials for the stools suggest to "[s]et up this stool in your home or office *to get a core workout*" (emphasis added). *Id*. CBP nonetheless held that the stool was a "chair" rather than exercise equipment.

Because CBP has classified the backless balance ball stool as a seat under heading 9401, HTSUS, CBBCs are properly classified as seats under the same heading. CBBCs' presence of backrests is itself a defining feature of a chair, and its addition supports rather than undermines classification under heading 9401, HTSUS.

The classification of the analogous product as a seat by CBP itself confirms that balance ball seating articles are recognized as seats within heading 9401, HTSUS.

CONCLUSION

CBBCs are classifiable as seats of subheading 9401.80.40, HTSUS. For the foregoing reasons, plaintiff respectfully requests that the Court grant its motion for summary judgment and order CBP to reliquidate the subject entries with classification of the subject merchandise under subheading 9401.80.40, HTSUS, and to refund the excess duties paid with interest as provided by law.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, 36th Floor
New York, New York 10022
(212) 557-4000
sraymond@gdlsk.com

*/s/ Sarah E. Raymond*
Robert B. Silverman
Sarah E. Raymond

Dated:  May 8, 2026
        New York, New York

24

**CERTIFICATE OF COMPLIANCE**

Pursuant to USCIT Standard Chambers Procedures Rule 2(B), I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains [WORD COUNT] words including text, headings, footnotes, and quotations. This word count is within the limit of 14,000 words set forth in Rule 2(B).

<div style="margin-left:50%">

Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP
*Attorneys for Plaintiff*
599 Lexington Avenue, 36th Floor
New York, New York 10022
(212) 557-4000
sraymond@gdlsk.com

*/s/ Sarah E. Raymond*
Sarah E. Raymond

</div>

Dated:  May 8, 2026
        New York, New York

25

15229286_1